### THE SIMON DUMOIS.

#### (Circuit Court of Appeals, Fourth Circuit. July 22, 1908.)

#### No. 732.

COLLISION—STEAMERS MEETING IN FOG.

> Evidence considered, and *held* not to establish the fault of a steamer outward bound from Baltimore for a collision with a meeting steamer in a fog as she was passing under the stern of an anchored schooner; it being shown that she was navigated with great care, at slow speed, and was outside of the dredged channel, on the anchorage grounds on her own side of the channel.

Appeal from the District Court of the United States for the District of Maryland.

Francis S. Laws, and Arthur D. Foster (Foster & Foster, and John F. Lewis, on the brief), for appellant.

Frederick M. Brown (Butler, Notman & Mynderse, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

BOYD, District Judge. This is an appeal from a decree in admiralty rendered by the District Court for the District of Maryland, at Baltimore. The appellant, the Di Giorgio Importing & Steamship Company, filed a libel against the steamship Simon Dumois, the appellee, to subject the latter to the payment of the value of a cargo of bananas, laden on the steamship Iberia, alleged to have been destroyed as the result of a collision between the two said steamships near Ft. McHenry, in the harbor of Baltimore, on the 7th of March, 1904, which said collision is alleged to have been caused solely by the fault of the Simon Dumois. The Iberia was bound for Baltimore, fully laden with the cargo aforesaid, and the Simon Dumois was outward bound, in ballast. The allegations of the libelant are:

"The steamship Iberia with a perishable cargo of bananas, left the quarantine station about 7 o'clock on the morning of the collision, bound for Baltimore. The weather was foggy at starting, but the pilot was able to pick up the buoys which mark the northeastern boundary of the channel, and proceeding at a speed of about two knots an hour, and blowing fog signals at regular intervals, he continued along the line of these buoys, near enough to distinguish the numbers on some of them, until those on the bridge sighted the topmast of a four-masted schooner lying at anchor on the southwesterly side of the channel and partially across it. No change was made in the course of the Iberia until she reached a point about 700 feet from the stern of the

schooner, when a fog whistle was heard coming from the vicinity of the schooner and on the port bow of the Iberia. The Iberia answered with a fog signal and ported her wheel, and almost immediately thereafter a steamer (which subsequently proved to be the Dumois) loomed up, coming around the stern of the schooner, and headed directly across the channel and the Iberia's course. The wheel of the Iberia was at once put hard aport, the engines were reversed, and signals given. Within a space of time estimated from a half a minute to a minute, the Dumois, continuing her course across the channel, struck the Iberia on her port side, just forward of amidships, and sunk her. The Iberia, at the instance of the collision, was stopped, or practically so. After the collision the Iberia drifted with the tide in the direction of Ft. McHenry, where she finally took bottom some four hours later. The Dumois left the harbor of Baltimore outbound about 7:15 a. m. on the same morning. The weather was hazy and rainy, and the pilot laid her course 'on the southernmost edge' of the channel until he had passed opposite Ft. McHenry, when he ported his wheel about two points and deviated from his course about 100 feet in order to pass under the stern of an inbound schooner. After clearing the schooner the wheel was starboarded, and the vessel again brought upon her channel course and steadied, when a four-masted schooner at anchor was observed about a mile ahead, lying over the southern edge of the channel. The vessel was under full speed at this time, but shortly thereafter a heavy fog bank was seen ahead, which completely enveloped the schooner. The steamer continued until within about 100 feet of the fog banks, when she reduced her speed to slow, and blew fog whistles. This course was held for 10 or 12 minutes, until the schooner was seen in the fog about 150 feet away, and almost ahead, when, in order to avoid the schooner, the engines were stopped and the wheel hard astarboarded, to pass under her stern. This altered the course of the steamer from parallel with the channel to almost directly across it. After clearing the schooner orders were given to port the wheel and go slow ahead, but before either could be executed a fog whistle was heard from the Iberia. The engines were ordered reversed, but before any of these orders could be carried out the Dumois' headway had carried her across the channel and brought her into collision with the port side of the Iberia with sufficient force to crush in her side. At the time of the collision the Iberia was cargo laden and drew 19 feet of water, while the Dumois was light and drew but 14 feet 6 inches of water."

The libelant further insisted that the collision occurred on the north-easterly side of the ship's channel and somewhat astern of the anchored schooner before referred to, and that the disaster was due to the fact that the Dumois, in her efforts to avoid striking the schooner, had turned and was steering diagonally across the channel and into the path of the incoming Iberia, so that, whilst the Iberia was proceeding in her due course, the Dumois, by this misdirection of her course, was the sole cause of the collision. On the other hand, the appellee, in the answer, insists that the Simon Dumois, at the time of the collision, was navigating well on the outward bound one-half of the channel, and probably, if not on the anchorage ground, adjoining that side of the channel; that all reasonable skill, care, and prudence was used by the navigators in laying and maintaining a proper course; and that when the collision of the two vessels was imminent, and as soon as the danger was discovered, all proper signals were given by the navigators of the Dumois, and every means within their control was used to prevent the collision; but that it took place, and was due not to the fault of the Dumois, but to surrounding conditions, over which her navigators had no control.

Testimony was introduced both by the libelant and by the respondent relative to the facts and circumstances attending the navigation of

the two ships and the collision which occurred. Of course, there is, as generally in cases of this character, much contradictory testimony, which, however, was considered, as we readily gather, by the trial judge, whose duty it was, under the rules of evidence, to reconcile, if possible, conflicting testimony, but, if the testimony is so absolutely contradictory as to be incapable of reconcilation, then to accept such of it as he believes and disregard such as he does not. In this situation the trial judge found the following facts:

"The collision occurred, I think, well within 100 feet of the stern of the schooner, as is established by the strong probative facts and testimony. It seems to me that the proof leaves no doubt that the Dumois was not in the channel at all, but at the time of the collision was within the water of the dredged-out anchorage ground to the south of the channel. There is ample proof that the Dumois was navigating with great care. All her officers were on deck, her first officer having been stationed on the bow as a lookout, and her master was with the pilot on the bridge. Her speed when the fog set in was slow, and when the schooner was seen, her engines were stopped. When the collision occurred, her engines were making full speed astern. I can find no particular in which it can be justly said that the Dumois was in fault. As the Iberia is not represented in this litigation, I forbear to comment upon her navigation. * * * From a patient consideration of all the testimony, my conclusion is that none of the faults charged against the Dumois have been sustained."

After a careful reading and consideration of the testimony, we find no sufficient ground upon which to disturb these conclusions, and the decree of the District Court of Maryland is therefore affirmed.

Affirmed.

NOTE.—The following is the opinion of MORRIS, District Judge:

MORRIS, District Judge. This suit grows out of a collision which occurred just outside the inner harbor of the port of Baltimore on the morning of March 7, 1904, in a dense fog. The colliding vessels were two small Norwegian fruit steamers, the Iberia, about 500 tons, and the Simon Dumois, about 428 tons net register. The Iberia, having made a voyage from Cuba, was entering the port with a cargo of bananas belonging to the libelant. The Simon Dumois was without cargo, and had just left the port bound out to sea. The collision occurred in the dredged channel or anchorage ground, something over a mile below the entrance to the inner harbor at Ft. McHenry.

The Iberia had remained at the quarantine dock the night before, and a little after 7 o'clock in the morning, with a licensed pilot in charge, she got under way to come to her dock in the harbor. There was a dense fog, and her pilot testifies that she came slowly, blowing fog signals. The pilot says he was running the channel course N. W. by N. and observing as he passed them the channel buoys, indicating the northern side of the channel. He sighted a four-masted schooner at anchor, seeing the tops of her masts above the fog, and, when close to the schooner, he heard a fog whistle on his port bow. He ordered his helm to port, and discovered a steamer (the Simon Dumois) coming out from under the stern of the four-masted schooner about, as he states, 700 feet off. He then ordered his helm hard aport and his engines full speed astern, but in a few (560) moments the Dumois ran into the Iberia, striking her on the port side about amidship, making such a hole in her that she gradually settled, and, drifting with the wind in the direction of Ft. McHenry, finally sank, and her cargo of bananas was a total loss.

The case stated in the answer filed on behalf of the Simon Dumois is: That she had left the port of Baltimore on the same morning at 7:30 a. m., at which place the atmosphere, although misty, was good for seeing. That she passed outside Ft. McHenry in the channel, and was proceeding on a course S. E. by S. parallel with this course and to the southward of the center of

the channel, when a thick fog was encountered. That she then slowed her speed and blew fog signals, and was about to anchor and had stopped her engines for that purpose, when a four-masted schooner was observed nearly ahead showing her starboard side with her bow pointing away from the channel to the south and west. The Dumois' course was then shaped to pass under the schooner's stern. The order had been given slow ahead, when the Iberia was seen approaching through the dense fog. The Dumois' engines were reversed, but notwithstanding the two steamers collided, and the bow of the Dumois punched a hole in the port side of the Iberia a little forward amidship.

This libel was filed by the owner of the cargo of the Iberia, charging the Dumois with the loss of the Iberia's cargo and alleging that the Dumois was in fault in the following particulars, viz.:

(1) In failing to maintain the proper course for outbound vessels on the right-half side of the channel.

(2) In failing to blow proper fog signals.

(3) In going too fast under the circumstances and failing to slow down.

(4) In failing to stop and reverse.

(5) In failing to have a sufficient lookout.

The owner of the cargo in instituting this suit was under the embarrassment of having no help from those navigating either of the ships. They were both Norwegian vessels, and were both insured by the same underwriters. Shortly after the collision there was an official inquiry held by the Norwegian consul at Baltimore, the finding of which was that the collision was caused by unavoidable accident. The Iberia having sunk, her crew were soon returned to Norway, and what their testimony might be could not be ascertained.

The faults alleged against the Dumois now relied upon by the libelant after the testimony has all been presented and after the libelant's proctors have been able to carefully consider it, are:

(1) Attempting to navigate down the channel when a vessel could not be seen more than half a ship's length off and when those in charge of the Dumois knew that the schooner was lying in the channel, and should have known that an attempt to pass her might carry the Dumois so far into the channel as to obstruct inbound vessels.

(2) In standing too close to the anchored schooner before changing the Dumois' course in order to pass under the schooner's stern.

(3) In directing the course of the Dumois across the channel in her effort to avoid the schooner.

(4) In not keeping to the side of the channel which lay to her starboard.

As to the course of the Dumois with regard to the channel, there are circumstances and testimony which fix that with more than usual certainty. The four-masted schooner was fast to the ground. She had been there for two days for the reason that the pin holding the forward part of her center board had broken, and the center board had dropped down below her keel some 12 to 16 feet. She drew 19 feet, and the additional draft of the center board would make her draw 30 to 35 feet. In consequence of this, while being towed into an anchorage, she fetched up against the mud bank at the anchorage ground. That fixes her position on the southwesterly edge of the dredged anchorage ground adjoining and parallel with the channel proper. The dredged anchorage ground is 400 feet in width, and the width of the channel is 600 feet. It seems to be conclusively proved that the Dumois before she starboarded her helm to pass, under the stern of the schooner was on a course well to the southwest of the southwestern edge of the channel, which was the edge on her starboard side. The mate of the schooner was on the deck on watch, and ringing the schooner's bell on account of the fog. He was watching the two approaching steamers, and had nothing else to do but to observe them, and was interested in doing so because they were both coming towards his vessel. He testifies that the Dumois was approaching on his starboard bow and the Iberia on his port beam. They both continued he states until about 150 feet off, when both headed more to the north and eastward in order to pass his stern; that the Dumois passed about 30 feet from the schooner's stern, and then they collided, as he testifies,

about 100 feet from the schooner's stern. This is the testimony of a witness who from a stationary vessel saw the collision. It seems to me it fixes with certainty that the place of collision was well to the southwestward of the center line of the channel, and that the Dumois deflected from her course along the southwestern edge of the channel only so far as was absolutely required to pass under the stern of the schooner, which was aground outside of that edge on the edge of the dredged anchorage ground. The schooner's stern did not project at right angles towards the channel, but she was lying at an angle at about 40 degrees to it, with her stern pointing nearly north and her bow nearly south, the course of the channel being N. W. by N. and S. E. by S. In his testimony the schooner's mate also states that, when approaching the schooner, both steamers were going at a moderate speed, the Iberia with a little more speed than the Dumois, and that both were blowing fog signals. He testifies that he heard the bells to reverse on the Dumois before she had reached the schooner's stern. He observed an officer and a couple of sailors on the bow of the Dumois working with her anchor. This testimony, confirmed as it is by witnesses from the Dumois, establishes, not only that the collision took place near the western edge of the channel, but also that the Dumois passed the schooner's stern at a distance of less than 50 feet, the mate says 25 feet, certainly as close as it was reasonably safe to go. The testimony of the captain of the schooner who came on deck just at the moment of the collision gives as his observation that both steamers were going very slowly.

The licensed Maryland pilot who was navigating the Iberia testifies that the Iberia was close to the buoys on the eastern edge of the channel, but it is impossible to reconcile this location with established facts, and, when first examined (about 10 months closer to the collision in point of time), he stated that "the collision occurred about 100 feet astern of the schooner which vessel was lying on the south side of the channel." He testifies that, when he and the master of the Iberia, about 7 o'clock on the morning of the collision, observed the dense fog which prevailed at the quarantine ground, he expressed to the master his opinion that it was not prudent to start with the fog so thick, but that the anxiety of the master to get to port prevailed upon him to try it. He testifies that when he first heard the fog signal of the Dumois, he put his helm to port and continued his speed of slow ahead until the Dumois came in sight coming out from underneath the schooner's stern, and he then gave the order hard aport and full speed astern.

Gray, the licensed Maryland pilot in charge of the Dumois, testifies that at 7:30 a. m., when he got the Dumois under way to take her from the dock in the harbor, there was no fog, that it was raining, but one could see a mile or two; that he passed out by Ft. McHenry keeping to the southerly edge of the channel, and he saw about a mile off a four-masted schooner at anchor, and he straightened on his course with the four-masted schooner a little on his starboard bow, intending to pass the schooner about 100 feet astern of her; that just then there appeared between the Dumois and the schooner a heavy fog bank and the Dumois engines were slowed and she blew fog signals; that the Dumois very soon entered the fog bank, and the pilot concluded to anchor and gave orders to get the anchor ready. Just as he had about concluded to let go the anchor and had stopped the Dumois engines, he saw in the fog the four-masted schooner only about 150 feet away, and thought it would be too close to her to anchor at that place, and concluded to pass around under the schooner's stern and anchor on the other side of her. He then starboarded his wheel, and got the schooner about two points on his starboard bow, but had nearly lost his headway. He was about to order his engines slow ahead when he saw the Iberia about two points on his starboard bow and about two lengths away, apparently going with some speed. He immediately signaled the engine room full speed astern, and blew reversing signals, but the vessels came together, the Dumois bow striking the Iberia a light blow amidship.

Olsen, the man at the wheel on the Dumois, testifies that, when the Dumois reached the schooner, the schooner was directly ahead, and that to clear her the pilot ordered the helm hard astarboard, and the Dumois had just cleared the schooner's stern when the Iberia was struck; that before they struck he received an order to port his wheel; that the Dumois engines had stopped

before the Iberia was seen, and when she was seen the order was full speed astern. He testifies that the Iberia had considerable headway as he could see foam under her bow.

Lindbow, the first officer of the Dumois, who was on the bow, testifies that the second mate and two seamen were also on the bow getting the anchor ready, but that he was exclusively engaged in acting as lookout; that he saw the Iberia coming with such speed that there was foam under the bow.

Johannasen, one of the seamen who was on the bow ready to let go the anchor, testifies that he heard the first officer (acting as lookout) report the Iberia on the Dumois' starboard bow, and that she was coming fast as he could tell by the waves under her bow.

Christiansen, the chief engineer of the Dumois, testifies that the Dumois went out of the harbor at slow speed, then three or four minutes at full speed, and that then he heard the fog signals of the Dumois and received an order to go slow and went slow four or five minutes, and then received order to stop the engines, and that the engines were stopped five or six minutes; that then he received an order to go slow ahead, but had only made two or three revolutions when he received the order full speed astern, and had made eight or ten revolutions full speed astern when the vessels struck.

Capt. Nieuwejaar, the master of the Dumois, who was with the pilot on the bridge, testifies that, when he could first see the schooner after she was hidden by the fog, she was about half a ship's length from the Dumois' stern: that she was on his starboard bow, but he could see part of her starboard side as well as the whole of her port side; that at the moment of the collision the Dumois was so near to the schooner that he could have talked to persons on board of her, not being over 30 to 40 feet away; that, as soon as the Dumois cleared the schooner's stern, her wheel was ordered to port, in order to direct the course of the Dumois to her proposed anchorage, but the Dumois was nearly stopped and without steerageway, and the order had not taken effect when he saw the Iberia right upon them and the order was given to put the Dumois engines full speed astern and reverse signals were twice blown before the collision; that the only fault he attributed to the Iberia was that she had too much speed.

From a patient consideration of all the testimony, my conclusion is that none of the faults charged against the Dumois have been sustained.

After the testimony was all produced in court and the case had been fully presented and argued by proctors on both sides, the learned and zealous proctors for the libelant obtained leave to file a brief, and in their most carefully prepared brief and as the result of all the testimony they formulated the four several faults of which they contend that the Dumois was guilty.

First. That she attempted to navigate down the channel in a fog so dense that a vessel could not be seen more than half a length ahead, and when they knew that the four-masted schooner was lying partly across the channel and that the attempt to pass her might carry the Dumois beyond the middle of the channel to the obstruction of the incoming vessels. With respect to the charge of fault in navigating in so dense a fog, it is to be borne in mind that, when the Dumois left the harbor to proceed to sea, there was no fog, and that the fog bank came up the river from the southward after the Dumois entered the channel below Ft. McHenry, and that she almost immediately stopped her engines and prepared to anchor and would have anchored before the collision, except that the four-masted schooner which was grounded on the edge of the anchorage ground made it seem reasonably prudent and necessary to get past her before anchoring. The Dumois was intending to anchor as soon as she reasonably could after the fog came on and was guilty of no fault under all the circumstances, being out of the fairway, in seeking a safe place in which to cast anchor.

The second fault charged is "in standing too close to the anchored schooner before changing her course in order to pass under the schooner's stern." It was proper for the Dumois to keep away from the center of the channel as much as possible, and to do this it was proper to pass close under the schooner's stern which to some extent extended out northerly from the southern bank of the dredged quarantine anchorage adjoining the southern edge of the channel. I can see no grounds whatever for the contention that keep-

ing as close as possible under the stern of the schooner and as far away as possible from the center of the channel was not proper navigation for the Dumois.

The third fault charged is that the Dumois directed her course across the channel in her effort to avoid the schooner. I think the manifest preponderance of testimony does not support this charge. I do not think the Dumois ever was to the north of the center of the channel or near to it. I do not think the proof establishes that the Dumois by starboarding her helm changed her course more than two points from S. E. by S. the course of the channel, in order to pass under the schooner's stern, and that was at a time when she hardly had sufficient speed for steerage way and the order to port was immediately given as soon as the schooner was cleared, but the order full speed astern came so quickly after it that the order to port did not have any effect.

The fourth fault charged is that the Dumois violated the rule requiring steam vessels in narrow channels when it is safe and practicable to keep to that side of the fairway or midchannel which lies on the starboard side of such vessel. The preponderance of proof does not support this charge. The channel at the place of collision is 600 feet wide. Adjoining this to the south and west is the dredged anchorage which is 400 feet wide, making the whole width of the deep water 1,000 feet. The schooner was aground by reason of the dropping down of the center board on the southerly and westerly edge of the anchorage ground. The collision occurred, I think, well within 100 feet of the stern of the schooner as is established by the strong probative facts and testimony. It seems to me that the proof leaves no doubt that the Dumois was not in the channel at all, but at the time of the collision was within the water of the dredged out anchorage ground to the south of the channel.

There is ample proof that the Dumois was navigated with great care. All her officers were on deck, her first officer having been stationed on the bow as a lookout and her master was with the pilot on the bridge. Her speed when the fog set in was slow, and when the schooner was seen her engines were stopped. When the collision occurred, her engines were backing full speed astern.

I can find no particular in which it can be justly said that the Dumois was in fault. As the Iberia is not represented in this litigation, I forbear from comment upon her navigation.

I will sign a decree dismissing the libel.